Conger, Executor, vs. City of New Orleans.

## No. 7945.

### W. B. CONGER, EXECUTOR, VS. CITY OF NEW ORLEANS.

The pledgor himself may be in some cases the detainer *ad hoc* of the pledge for account of the pledgee, but when, having been so, he has sold the property pledged, it cannot be held that prescription of the debt remains interrupted by the existence of the pledge.

Though by Act No. 5 of 1870, writs of *fieri facias* and mandamus could not be issued against the City of New Orleans, yet a creditor was not prevented from bringing his suit against said city, and he could, therefore, interrupt prescription by citation.

The statement, made under Act No. 7 of 1870, by the Administrator of Public Accounts to the City Council, of the debts of the City, cannot be held as an acknowledgment of those debts, which should interrupt prescription.

When a coupon once attached to a bond has been severed from it, and both are negotiable, they represent separate and independent debts or securities, and the payment of the coupon is not an acknowledgment of the debt represented by the bond and will not interrupt prescription on the latter.

$\mathbf{A}$PPEAL from the Fifth District Court, parish of Orleans. *Rogers, J.*

Joseph Brewer and E. T. Florance for Plaintiff and Appellant.

First—Prescription does not run during the existence of a pledge.

Second—Act 109, of the Acts of 1854, made a *perpetual pledge* of the stock of the railroad company, subscribed for by the City of New Orleans, in favor of each and every holder of the bonds issued in pursuance of the provisions of said Act, and the ordinance of the Common Council of said city, approved April 7th, 1854, and subsequently ratified by the duly qualified voters of said city, on the 21st day of April, 1854, and consequently prescription cannot, and did not, run against said bonds.

Third—The action of the City of New Orleans in issuing the bonds sued on, secured as they were by the law which authorized their issuance, and acting as owner of the stock of the railroad company, estops her from denying that the stock was pledged to meet the redemption of the bonds.

Fourth—The bonds themselves state on their face that the railroad stock stands *forever pledged* to secure their redemption. On the faith of which statement the bonds found a money market, and, therefore, the city is again estopped from denying the existence of the pledge.

Fifth—Act No. 53, of 1874, postponed the maturity of the bonds sued on until December, 1876, from which time, therefore, prescription should be calculated.

Sixth—The prohibition to issue a *fi. fa.* against the city (Act 1870, No. 5), and to mandamus (under Act 1874, No. 53), makes applicable the rule " *Contra non valentem, non currit prescriptio.*"

Seventh—The bonds sued on were acknowledged by semi-annual statements of the city, within the time required for prescription, and prescription was thereby interrupted.

Eighth—The payment by the city of interest coupons to the holder of the bonds sued on, less than five years before the institution of this suit, interrupted prescription on the several bonds of which these coupons formed a part.

E. H. Farrar for Defendant and Appellee.

First—A statutory pledge of stock in a railroad corporation, made to secure the payment of certain bonds, issued by a municipal corporation in payment of its subscription to said stock, where the pledgee never has any possession or control of the stock so pledged, does not interrupt prescription on the bonds.

Second—It is not the contract of pledge which tacitly interrupts prescription, but the actual possession by the creditor and pledgee of the thing pledged.

Third—The Act No. 53, of 1874, applies on its face and by its terms only to those classes of bonds for which sinking funds had been provided by law. No sinking fund was ever provided to pay the railroad bonds.

Fourth—The maxim *contra non valentem* has no application, because Act No. 5, of 1870, did not hinder, delay, or obstruct the bringing of an action on the bonds.

Fifth—The reports of the Department of Public Accounts are mere statements of the fact of the issuance and outstanding of certain bonds, and are not acknowledgments of the *right* of the bondholders.

C. C. Art. 3520 ; 1 An. 343 ; 13 An. 579.

Sixth—Where a bond and coupon both fall due on the same day, and the coupon is subsequently presented for payment, severed from the bond, and is paid, such payment is no acknowledgment of the right of the holder of the bond ; and this, for the reason that the coupon and the bond, though physically attached, and though originating contemporaneously from the same contract, are separate and independent instruments, the one representing the capital of the debt, and the other representing the interest, capitalized by anticipation. The coupon has lost its character as mere interest, and has become a principal debt, itself bearing interest from maturity. 21 How. 539 ; 1 Wall. 175 ; 9 Id. 477 ; 20 Id. 583 ; 92 U. S. 502 ; 96 U. S. 62, 631 ; 98 U. S. 473 ; 32 Md. 501.

The opinion of the Court was delivered by

Bermudez, C. J. This is a suit to recover the amount of three

bonds of the City of New Orleans, of one thousand dollars each, dated May 1st, 1854, payable twenty years after date, issued under the provisions of Act No. 109, approved March, 1854. The bonds are unaccompanied by any coupon.

On the 17th of May, 1879, five years and sixteen days after the maturity of the bonds, the petition herein was filed.

Under Article 3540, R. C. C., the city pleads the prescription of *five* years.

In reply to this defense, the plaintiff says :

1st. Prescription does not run during the existence of a pledge. By the terms of the act cited, which was ratified by the people, and became executory, the stock owned by the city in the railroad company, for whose relief the bonds were issued, was perpetually pledged in favor of the bondholders.

2d. The City of New Orleans, by acting as owner of the stock and issuing the bonds, is estopped from denying the *pledge*.

3d. The time of maturity was extended by Act 53, of 1874, until December, 1876.

4th. The bondholders were prevented by Act 5, of 1870, from enforcing by *fieri facias* or *mandamus* the payment of their bonds, and the maxim, *contra non valentem* applies, and prescription was suspended.

5th. The city acknowledged her liability for the bonds in the reports of the Department of Public Accounts, and by paying the last coupons due on said bonds within five years prior to the institution of this suit, viz : the 18th of March, 1874.

I. The law requires, as an essential element to the contract of pledge, that the creditor be put in possession of the thing given to him in pledge, and, consequently, that actual delivery of it be made to him ; but the rule does not apply to incorporeal rights, the delivery being merely fictitious and symbolical. R. C. C. 3152, 3153. However, the pledge of stock, to be valid, must be followed by delivery. R. C. C. 3158 ; 1 R. 516 ; 7 A. 221; 19 A. 364 ; 1 A. 340 ; 1 R. 516 ; 23 A. 478 ; 22 A. 107 ; 15 A. 165 ; 14 A. 375, 393 ; 11 A. 223, etc. Possession, though essential to the validity of the pledge, need not be always in the creditor. It is sufficient that the thing pledged be in the possession of one occupying, *ad hoc,* the position of a trustee. The debtor himself may, in some cases, be considered as such trustee and be given possession of the thing by him pledged, provided his tenure be precarious and clearly for account of the creditor. The Louisiana doctrine is in perfect accord with both the common, the Roman and French laws. R. C. C. 3162 ; C. N. 2076 ; 21 Wall. 360 ; 5 Bing. N. C. 136 ; 1 Sandf. N. Y. 248 ; 2 Pick. 607 ; 15 Mass. 389 ; 2 Taunt. 266 ; Story on Bailments, 299 ; 14 Pick. 497 ; D. L. xiii, t. vii, 1. 35, 1. 37.

Pothier Nant. 8 ; Pothier Pandects, v. vii. p. 360 ; 2 Bell Com. on Scotch Law, 7th ed., p. 22 ; Troplong Nant., Nos. 97-99, 309, 311, 312 ; Dalloz Rep., xxxii, p. 455 ; 93-129, 313, 119, 121, 209, *vo.* Nant.; Duranton, v. 18, Nos. 525-531.

6 L. 516 ; 26 A. 35 ; 5 A. 274, 539 ; 7 A. 225 ; 5 Denio, N. Y. 269 ; 21 Wall. 360 ; 96 U. S., S. C., p. 476, in which the above authorities have been reviewed, analyzed and applied.

So that it is not correct to say, that the statutory pledge in this case (the stock remaining in the hands of the city) is not a valid pledge, and would not interrupt prescription, see 98 U. S. 396, because not in the hands of the creditors.

But of what avail can this position be to the plaintiff, when it appears that the stock pledged was sold by the city under legislative authority (Act 76 of 1870), and its proceeds applied to ordinary purposes. The bondholders might have interposed objections to the sale, but they did not do so. They have slept upon their rights. The pledge perished, as such, more than eight years before the institution of this suit. The plaintiff cannot claim that there exists a thing pledged in this case. His prayer does not ask for a privilege on the pledge. Even if it did, how could the Court allow it, when the pledge is no longer in existence, therefore beyond subjection.

II.   What becomes of this second defense of *estoppel*, when it appears that the pledge is no more ? Even if the city were estopped from denying the original existence of the pledge, what does it avail the bondholder to set up the estoppel, when the denial is verified by the absence of the pledge ?

The proposition advanced by plaintiff, that prescription does not run during the existence of the pledge, is indeed too firmly established to be, nor is it attacked.   21 A. 128 ; 22 A. 107, 117 ; 23 A. 293 ; 7 Marcadé 205 ; Troplong Presc., 618, 628, 534 ; 10 Otto, 450. It is not the contract or act of pledge that interrupts prescription, but it is the *detention* of the thing pledged by the creditor, or some one, by consent, for his account. Such *possession* is a constant renunciation of prescription every instant that it begins to run.   Troplong Pr.; 65, 75, 254.

III.   The Act of 1874, No. 53, did not postpone the maturity of the bonds in question.   It merely dispensed the city from levying any tax for sinking fund purposes of any bond whatsoever.   It has no reference at all, in that respect, to the bonds sued on, or similar ones, as the law under which they issued never required a tax for a sinking fund for their benefit.

IV.   Whatever may be said concerning Act 5, of 1870, which was prohibitive of the issuance of writs of *fieri facias* and *mandamus* against the city, to draw money, directly or indirectly, from the municipal

treasury, it cannot be claimed that, under the provisions of that statute, suits could not be *brought* against the city, the service of citation in which would have interrupted prescription, for the act distinctly provides for the institution of proceedings *via ordinaria*, and for the registry of judgments thereby obtained against the city. Had the plaintiff instituted suit, and cited the city within the five years following the maturity of the bonds, the city could not be listened to to-day when urging the defense of prescription.

V. Act 7, of 1870, sec. 9, § 6 (city charter), which relates to the Department of Public Accounts, provides that it "shall have a general superintendence of all *claims* and *demands* against the City of New Orleans. It provides also for the laying *before the Council* of a report of the claims and accounts, and of a statement of the indebtedness of the city, showing, in detail, all outstanding obligations, their date, amount, to whom and for what issued, when due, and under what ordinances and resolutions authorized.

By this law the duties of the Administrator of Accounts are defined and regulated between him as a municipal officer or agent, and other municipal officers or agents, all representing the corporation. Nowhere does the law authorize this administrator to acknowledge any claim against the city, so as to make it an indebtedness binding on the city. The object which the law had in view was the transmission by this administrator to the City Council of information touching the condition of city affairs as disclosed by his books. The *statement* of *indebtedness* required to be furnished by him, semi-annually, was to serve as an *exhibit* of the apparent (real or nominal) indebtedness of the city. The statute does not bear any other interpretation. The entry and statement of the outstanding debt was never designed to prove an acknowledgment of indebtedness so as to interrupt prescription. 1 A. 343 ; R. C. C. 3520.

The distinction between the acknowledgment that an evidence of indebtedness has been uttered and is outstanding, and the admission of the right of the holder of such evidence of indebtedness, to demand and enforce payment, is quite apparent. R. C. C. 3520 ; 13 A. 579.

One may well admit, *as a fact*, the issuance by him of a certain note, since the maturity of which ten years have elapsed without exposing himself by such admission, to being dealt with as having acknowledged thereby an indebtedness and an obligation to pay. Unless the acknowledgment be *clear* and *precise*, courts cannot consider it. Troplong Pr., p. 131 ; No. 614, p. 51 ; No. 524 ; Cass. 21 Sept. 30 ; 13 A. 579 ; Marcadé Pr. 145, x ; Dal. 31, 1, 23 ; 9 A. 15 ; 11 A. 83–212.

"*Simplex recognitio, non disponit nec immutat statum rei,*" says Dumoulin.

We cannot admit the correctness of the proposition advanced by the plaintiff, that the payment by the City of New Orleans of the last matured coupons of the bonds, some seventeen days after the maturity of the bonds themselves, is an admission by the city of the existence of the debt, which was the principal obligation, of which the interest, represented by the coupons, was the accessory. The proposition may be, in most cases, a correct one, but it is not so in the present instance, in which the bond and the coupons are independent debts, which have a distinct and separate value. They evidence different obligations to pay money. For convenience only is it that the diminutive promises to pay, styled "*coupons*," are attached to the original or primitive debt, the bond. They can be detached from the bond, and sold in the market separate from the bond. They can be sued upon by one who is not the holder and owner of the bond. They pass as negotiable securities. 21 How. 539 ; 1 Wall. 175 ; 9 Id. 477 ; 20 Id. 583 ; 92 U. S. 502 ; 96 U. S. 62, 631 ; 98 U. S. 473 ; 32 Md. 501.

Daniel on Neg. Inst., ₰ 1488–96, vol. 2, p. 442, second ed.; Bouvier v. 1 (14th ed.), 373.

A bond is generally issued with coupons attached to it, but those coupons may be *secured* and negotiated before the maturity of the interest they represent, and *thus* pass as *separate* and *independent* securities, like other commercial instruments.

18 Gratt. 776 ; 20 Wall. 584 ; 21 Howard 539 ; 3 Wall. 327 ; 44 Penn. 60 ; 10 Wis. 136 ; 2 Metcalf Ky. 56 ; 17 Conn. 243 ; 25 N. Y. 496 ; 13 Ind. 161 ; 102 Mass. 503 ; 8 R. I. 375.

In this case the coupon was detached. From the moment it was so severed, it became a separate and independent security, ceasing to be part and parcel of the bond as a substantive part thereof. 9 Wall. 483 ; 14 Wall. 296. There exists a marked difference in the character of coupons according as they are or not detached or severed from the bond. Arny vs. Dubuque, 96 U. S. (8 Otto), p. 470, and authorities there quoted and reviewed.

We can well conceive of the possibility of a bondholder selling his bond before maturity to the corporation by which issued, and of the outstanding, after such sale, of the coupons originally attached, but subsequently severed from it. Could it be claimed that, because of the payment of the coupons after the purchase of the bond by the corporation, the debt evidenced by the bond has revived ? Surely not. The debt was extinguished by payment. But that is not the only mode of extinction of obligations. R. C. C. 2130. Prescription, as effectually destroys an obligation before the law, so as to prevent its enforcement, as payment does. It is based on the presumption of payment, or of

remission or abandonment of the debt, and is based upon consideration of public order and policy.

Troplong on Prescription, Art. 2219, C. N.

Marcadé on same, and numerous authorities quoted by them.

There exists a case, in which a principal debt, resulting from a contract, may be due, while the fruit thereof may be prescriptible. R. C. C. 3538 ; Succ. Canonge, 1 A. 209.

The maxim *minima agnitione debiti, tollitur prescriptio,* does not apply, because of the severance of the debt which was represented by distinct evidences of indebtedness, payable separately, at different dates, except that of the maturity of the bond, and of last coupon thereof. A part payment of the bond; or a part payment of the coupon, or a judgment of interest, however small, of the interest running directly on the bond at its maturity, or on the coupon, if any do run thereon, would certainly be susceptible of being urged as an acknowledgment of indebtedness of the remaining unpaid portion of the debt. The maxim *partis approbatione, totum approbamus* would then receive application. Take the case of a purchaser of real estate on credit, who issues in settlement of the price two notes at one year, and who pays one of them on the last day of the five years following its maturity, could it be claimed that by such payment he has acknowledged his liability to pay the other note, although more than five years had elapsed since its maturity, without any interruption of prescription within that time ?

Troplong, Prescription, Art. 2248, p. 130.

Marcadé, Prescription, same Art., p. 122, X 145.

The judgment of the lower court sustained the plea of prescription. We find no error in it.

It is, therefore, ordered that the judgment appealed from be affirmed with costs.

Rehearing refused.